UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

MARC TISHFIELD,

                Plaintiff,

      -against-

BELAL K. FARUKI, JAMES N. BARRY,
MARK A. HOPKINS, RONALD L. WEILERT,
NEURAL MARKETS, LLC (Illinois),
NEURAL MARKETS, LLC (Delaware), KEITH A. HOOPER,
WEILERT INVESTMENTS, LLC, HOPKINS
AND ASSOCIATES, P.C., EVOLUTION
QUANTITATIVE 1X FUND,
and EVOLUTION QUANTITATIVE 1X, LLC

                Defendants,

JP MORGAN CHASE & CO.,

                Relief Defendant.

Docket No.  11 CIV 6359 (JSR)

**COMPLAINT**

-------------------------------------------------------------x

       Plaintiff Marc Tishfield ("Tishfield") by and through his attorneys, the Law Offices of

Alan S. Futerfas, allege the following as and for his Complaint against the defendants:

## <u>SUMMARY OF THE ACTION</u>

       1.      This matter involves a fraudulent scheme perpetrated by defendant Belal K.

Faruki and the other defendants to obtain money from Tishfield through false offerings and other

misstatements and misrepresentations.  In January 2010, the Illinois Securities Department

charged Faruki with fraud in the sale of securities in violation of Sections 11 and 12.F, 12.G,

12.H and 12.I of the Illinois Securities Law and banned him from offering or selling securities

directly or indirectly until on or about September 24, 2010. Beginning in January 2010 and

continuing through September 2010 and thereafter, Faruki and his co-defendants violated the

Illinois ban and solicited Tishfield, who was acquainted with Faruki, with numerous false

representations designed to induce him to invest in a fund created by Faruki and the other

defendants. The defendants obtained a $1,000,000 investment from Tishfield through the use of

material misrepresentations, false statements and omissions about, among other matters,

investment returns, the number of investors, the amounts invested by others, the so-called trading

platform, the purported trading process, the degree of leverage employed, access to investment

returns, the officers and executive personnel, management of the fund, history of past lawsuits

and legal matters, the identity of the fund's accounting firm and prime broker and Faruki's

business acumen and financial wherewithal. Representations made with respect to each of these

and other matters were false.  Material omissions were also made.  These misrepresentations and

omissions are heavily documented. Defendants made these misrepresentations to Tishfield

through e-mails and BBIM (Bloomberg Instant Messaging), as well as in conversations,

marketing materials and in the private placement memorandum and related exhibits.  Contrary to

defendants' specific and false representations, Tishfield was the only investor in the defendants'

fund.

Defendants did not invest the funds in the manner they had repeatedly promised. In fact,

rather than investing the funds in a 1X type investment (no use of leverage), defendants engaged

in speculative futures trading in some cases utilizing more than 7 times leverage and lost 25%

(approximately $250,000) of the value of Tishfield's investment in a matter of a few weeks.

They were neither registered nor qualified by license nor legally exempt from registration or

qualification to invest in such and, in so doing, violated United States Commodity Future

Trading Commission ("CFTC") regulations requiring licensure, exemptions and/or registration to trade futures. Upon information and belief and as described below, defendants falsified TradeStation Securities, Inc. ("TradeStation") application documents and thereby deceived TradeStation (a Florida firm supplying electronic trading platforms as well as brokerage services) in order to open a futures trading account. Then, as part of the scheme to defraud, the defendants falsely described the investment returns to Tishfield and made other misrepresentations while they considered how to explain the massive losses they had so quickly incurred. The defendants supplied false information about the investment returns; made false claims to explain delays in providing investment and account information; and made up stories about occurrences in the marketplace and with respect to trades.

Defendants' fund account is only holding Tishfield's money. Yet, despite repeated redemption demands made upon Faruki and defendant Hopkins, an attorney, defendants refused all requests to return Tishfield's investment; refused to tell Tishfield the precise balance that remained of his investment; and refused to disclose where the monies were located, the number of the account or the names of the account signatories. In an effort to obstruct the reporting and investigation of this fraud, defendants threatened to take more of Tishfield's money unless he promised not to sue and endeavored to terminate any and all governmental investigations. Then, after promising Tishfield in a lawyer's letter that the remaining balance of his investment was in a segregated cash account with signatories other than Faruki, an additional $100,000 of Tishfield's investment was taken – actually converted – by defendant Hopkins, an attorney who represents Faruki and who was corporate counsel to and a partner in, the entity Neural Markets, LLC. This was done with the acquiescence and approval of defendants Barry and Weilert. Unbeknownst to Tishfield, Hopkins was charged with and arrested by federal authorities for

mortgage and bank fraud in September 2010, during a period of intense solicitation of Tishfield's investment in the fund. Hopkins' arrest on the federal fraud charges, which are still pending, was never disclosed to Tishfield.

Based on defendants' fraudulent activity, the SEC filed an enforcement action alleging five main causes of action for violations of the Securities Act, the Exchange Act, and the Advisers Act. Based on, *inter alia*, the strength of the presentation made and the likelihood of success of these claims, the United States District Court for the Northern District of Illinois ordered that all remaining funds of Tishfield's $1,000,000 investment (approximately $650,000) be seized and frozen pending resolution. All of these initial SEC filings and determinations are annexed as Exhibit A. In the aftermath of the SEC filing, a desperate Faruki has resorted to slandering Tishfield and making numerous demonstrably false statements to the press.

As a result of defendants' scheme to defraud, Tishfield brings this action to recover his initial investment of $1,000,000, statutory interest, damages and attorney's fees against the defendants based on violations of the Securities Exchange Act of 1934 (the "Exchange Act"), the Illinois Securities Act and various other statutes and common law causes of action.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa, and 28 U.S.C. Sections 1331 and 1337. The federal claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. Sections 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. Section 240.10b-5, promulgated thereunder by the Securities and Exchange Commission ("SEC"). Jurisdiction over the claims arising under state law is based on this Court's supplemental jurisdiction pursuant to 28 U.S.C. Section 1367.

4

3.     This Court has jurisdiction over the persons of the defendants pursuant to New York CPLR 301, 302(a)(1), 302(a)(3)(i), and 302(a)(3)(ii).

4.     Defendants conducted business within the State of New York pursuant to New York CPLR 301 and 302(a)(1).

5.     Defendant committed a tortious act within the State of New York or tortious acts outside the State of New York which caused injury to person or property within the State of New York pursuant to New York CPLR 302(a)(3).

6.     Within the meaning of New York CPLR 302(a)(3)(i), defendants regularly solicit business or engage in another persistent course of conduct or derive substantial revenue from goods used or services rendered in the State of New York.

7.     Within the meaning of New York CPLR 302(a)(3)(ii), defendants expect or should reasonably expect their tortious act or tortious acts outside the State of New York to cause injury to person or property within the State of New York and to have consequences within the State of New York.

8.     Defendants derive substantial revenue from interstate or international commerce within the meaning of New York CPLR 302(a)(3)(ii).

9.     In connection with the defendants' violations and conduct, they have directly and indirectly used the instrumentalities and means of interstate commerce including mails, electronic mail messages, telecommunications and other means located in the State of New York.

10.     Venue is proper in the United States District Court for the Southern District of New York pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa, and 28 U.S.C. Sections 1391(b) and (c).

11.     The defendants are either found in or are inhabitants of or transact business in this District within the meaning of Section 27 of the Exchange Act and 15 U.S.C. Section 78aa.

12.     The defendants directly and indirectly made use of the means and instrumentalities of interstate commerce, of the mails and electronic wires and communications, in connection with the transactions, acts, practices and courses of business alleged herein. Practically all of the defendants' false and misleading statements were made and or received in this District.

## PARTIES

13.     Tishfield maintains a residence in New York City and his principal place of business is in New York, New York. Tishfield has worked in the public and private sectors of the financial services industry for the past 24 years.

14.     Neural Markets, LLC (Illinois) ("Neural (IL)") is an Illinois limited liability company created in or about 2009 and identifies its principal place of business as both 464 and 484 Bellar Court, North Aurora, Illinois, the same address as defendant Belal K. Faruki, and at 161 North Clark Street, Chicago, Illinois 60601. Defendant Belal K. Faruki formed, created, managed and either owned or held a majority interest in Neural (IL). Faruki is a signatory on Neural (IL) bank accounts at JP Morgan Chase, N.A. ("JP Morgan"). The agent for Neural (IL) is defendant Hopkins & Associates, PC, located at 161 North Clark Street, suite 4700, Chicago, Illinois 60601.  Tishfield was never a member of or held an interest in Neural (IL). Tishfield was directed to and did send his $1,000,000 investment to a Neural (IL) account, where it was deposited on September 28, 2010.  Tishfield's money was thereafter transferred to another entity, Evolution Quantitative 1X, LLC, on or about October 6, 2010. Neural (IL) was dissolved on October 8, 2010.

6

15.     Neural Markets, LLC (Delaware) ("Neural (Del)") is a Delaware limited liability company created on or about September 7, 2010 with a registered agent address of Wilmington, Delaware. Defendant Belal K. Faruki formed, owned and managed Neural (Del). Upon information and belief, Neural (Del) has five members, defendants Belal K. Faruki (with a 67% interest) (identified as the Managing Member), Mark A. Hopkins (with a 2.5% interest), Keith A. Hooper (with a 2% interest), Weilert Investments, LLC (with a 27.5% interest), and James Barry (with a 1% interest). Tishfield was never a member of or held an interest in Neural (Del). Despite signing a private placement memorandum with Neural (Del), unbeknownst to Tishfield, the defendants directed Tishfield to send his investment to an account belonging to Neural (IL) and then sent the funds to another account unaffiliated with Neural (Del) or Neural (IL).

16.     As used in this Complaint, "Neural," "Neural Markets," or "Neural Markets LLC" includes either of Neural (IL) or Neural (Del).  The word "fund" as used in this Complaint includes and refers to any investment pool or account or entity in which Tishfield's money was placed and was owned, controlled, managed and or traded by Belal K. Faruki and or James Barry under various names including Neural Markets, LLC, the Evolution Quantitative 1X Fund and Evolution Quantitative 1X, LLC.

17.     Belal K. Faruki ("Faruki"), age 39, is a resident of North Aurora, Illinois and, since January 2010 if not before, has identified himself in emails and elsewhere variously as Chief Executive Officer, Managing Member and Portfolio Manager of Neural. In a Bloomberg Profile dated September 9, 2011, Faruki identifies himself as the "Chairman/CEO/Founder Neural Markets LLC 161 North Clark Street Chicago IL 60601." In another web based profile, Faruki identifies himself as the "chief executive officer of Neural Markets LLC, a Chicago based company that specializes in foreign exchange, futures and equity trading." Faruki includes this

7

description of his duties: "As CEO [of Neural], he is responsible for overseeing the day to day operations of the company and ensuring its efficiency and profitability, managing the accounts of high net worth individuals, and developing and implementing strategic plans." Faruki was a signatory on Neural accounts at JP Morgan Chase bank, N.A. Upon information and belief, Faruki was an undisclosed manager, investment manager, control person and/or associated person of an Evolution Quantitative 1X, LLC ("Evolution") account at TradeStation. Faruki was a signatory on an Evolution account at Interactive Brokers. Faruki has been the subject of repeated governmental enforcement actions and lawsuits. In 2001, the CFTC charged Faruki with fraud with respect to another Faruki entity called Limitup Trading, LLC. Faruki defaulted in the action and was ordered to pay restitution to his victim. In 2010, Faruki was charged by the Illinois Securities Department with securities fraud. According to the charges, Faruki sold securities through one of his entities called Logisol, Inc., in the sum of $150,000 and then converted those funds for his own personal expenses and to fund another Faruki entity called Neotick, Inc. In January 2010, the Illinois Securities Department barred Faruki from engaging in any investment or securities activity. The ban was in existence during the period of the solicitation of Tishfield by Faruki to invest in the Fund. The ban was lifted on September 24, 2010. Faruki has been the subject of 9 known lawsuits, including suits against him for taking money and not repaying the funds pursuant to his promises and commitments. Every Faruki entity known to plaintiff and his counsel has been the subject of lawsuits and governmental enforcement actions. These Faruki entities include: Limitup Trading, LLC (CFTC enforcement action); Limitup Holding, Inc. (plaintiff lawsuit); Logisol, Inc. (Illinois Securities Department enforcement action); Neotick, Inc. (improperly received funds from Logisol); Neural Markets, LLC (SEC enforcement action); Evolution Quantitative 1X Fund (SEC enforcement action); and

Evolution Quantitative 1X, LLC (SEC enforcement action).  Faruki filed for bankruptcy, Chapter

13, on April 25, 2002.  Faruki once held a number of securities licenses which lapsed in 2001.

He was previously registered with the National Futures Association ("NFA"). He is not currently

registered with the SEC in any capacity. He is not currently registered with the States of New

York or Illinois as an investment advisor or with the CFTC or any other Self Regulatory

Organization ("SRO") in any capacity.

      18.     Mark A. Hopkins and Hopkins and Associates, P.C. (collectively, "Hopkins") is a

resident of Chicago, Illinois, an attorney and an Illinois law firm, respectively.  During all

relevant periods, Hopkins was a member of and identified as "corporate counsel" to and

registered agent of Neural. Hopkins is the sole owner and operator of Hopkins and Associates,

P.C. Hopkins has been sued for misappropriating client funds in connection with real estate

transactions involving Hopkins and Associates, P.C.'s escrow account. The complaint in that

case is annexed hereto as Exhibit B. That case settled. Hopkins was arrested and charged in a

federal criminal complaint unsealed September 13, 2010 alleging that he committed bank fraud

in violation of 18 U.S.C. § 1344.  The criminal complaint charged Hopkins with participating in

a "double closing" scheme by which individuals acquire a distressed or foreclosed property by a

short sale, sell the property to a straw buyer at a higher value (often supported by an inflated

appraisal) and then split the mortgage loan proceeds.  A confidential informant made tape

recordings of Hopkins.  These charges are still pending and are annexed as Exhibit C.  Among

other activities in connection with the fraud defendants perpetrated on Tishfield, Hopkins, with

the authorization of the other defendants and without notice to or the consent of Tishfield,

removed $100,000 of Tishfield's money from the Evolution account and deposited it into his

Hopkins & Associates PC account on January 24, 2011.

19.     Evolution Quantitative 1X Fund ("1X Fund") was represented in the PPM and elsewhere to be an investment pool with very specific investment characteristics managed by Neural (Del).

20.     Evolution Quantitative 1X, LLC ("Evolution") is an Illinois limited liability company with its principal place of business in Oswego, Illinois at an address it shares with defendants Ronald L. Weilert and James N. Barry. Evolution was formed on October 5, 2010 and has two members, defendants Weilert and Barry.  Weilert and Barry are signatories on two Evolution trading accounts at TradeStation Securities, Inc. ("TradeStation") and Weilert is a signatory on three Evolution accounts at JP Morgan Chase, N.A. ("JP Morgan"). Tishfield's money was transferred from Neural (IL) to Evolution on or about October 6, 2010. Upon information and belief, defendants created Evolution in order to, among other things, disguise and conceal from TradeStation the fact that Faruki was a control person and responsible for the trading of Tishfield's funds at Evolution. Upon information and belief, by virtue of this deception, including the filing of false application forms, defendants were able to, among other things, conceal Faruki's control and management of the Tishfield's funds (and Faruki's negative regulatory history) and thereby open an account at TradeStation. Upon information and belief, the deception was also designed to conceal from TradeStation the fact that Evolution held and was trading futures with third party or "customer money." On January 24, 2011, and as a continuing part of the fraud, $100,000 of Tishfield's money was taken from an Evolution JP Morgan account and given to Hopkins.

21.     Ronald L. Weilert ("Weilert") has a place of business at 57 W. Van Buren Street, Oswego, Illinois 60543, and is a member and owner of Evolution and Weilert Investments, LLC. Weilert is a signatory on three Evolution accounts at JP Morgan Chase Bank, N.A., on two

10

Evolution accounts held at TradeStation, and on one Evolution account held at Interactive Brokers. Through Weilert Investments, LLC, Weilert owns a 27.5% interest in Neural.

22.     James N. Barry ("Barry") during the time period of this Complaint was a resident of Brooklyn, New York, and a member of Evolution. At all relevant times, Barry was employed by Barclays Capital, Inc., and held the position of Vice President, Barclays Capital, Fixed Income Credit Division. Barry has 1% equity interest in Neural and is a member and owner of Evolution and an authorized signatory on two Evolution accounts at TradeStation and one at Interactive Brokers. Upon information and belief, Barry's activities with defendants violated Barclays Capital rules, regulations and policies. Upon information and belief, Barry is no longer with Barclays Capital. He is not registered with the SEC in any capacity. He is not registered with the States of New York or Illinois as an investment advisor or with the CFTC or any other SRO in any capacity.

23.     Keith A. Hooper ("Hooper") has a place of business at 57 W. Van Buren Street, Oswego, IL 60543, which is the same address as Weilert, Barry and Evolution. Hooper is a member of Neural holding a 2% equity interest.

24.     Weilert Investments, LLC is a Delaware limited liability company with its principal place of business at 57 W. Van Buren Street, Oswego, Illinois 60543. It was formed on September 7, 2010. Weilert Investments, LLC is a member of and holds a 27.5% interest in Neural. Upon information and belief, Weilert is the managing member of Weilert Investments, LLC.

25.     JP Morgan Chase & Co. ("JP Morgan") is, *inter alia,* a worldwide securities services provider. The balance of the monies that Tishfield invested (approximately $641,000) is currently being held in a JP Morgan account. JP Morgan is being sued as a nominal defendant in

this action.  Pursuant to the SEC enforcement action, the Evolution account at JP Morgan holding Tishfield's money has been frozen and a preliminary injunction is in place.

26.     The words "Defendants" or "defendants" as used herein mean all defendants listed in the caption, aside from the Relief Defendant.

## THE FRAUDULENT SCHEME

27.     Tishfield and Faruki became acquainted in or about early 2007, when Faruki was engaged as a consultant at Tishfield's prior place of employment. In approximately April 2007, Faruki approached Tishfield about investing in a Faruki entity called Neotick, Inc., of which Faruki was President. Tishfield did not invest.

28.     In or about December 2008, Faruki told Tishfield that he had "missed the boat" on Neotick and offered him another opportunity.  Tishfield again declined.

29.     In January 2010, Faruki began soliciting Tishfield to invest in his fund which he described as "Neural". On January 21, 2010, Faruki, writing from "Neural Markets LLC," told Tishfield that he "launched [his] fund."  Faruki, who also identified himself as "Portfolio Manager, Neural Markets LLC," claimed that "my fund" was up 12% in December 2009 and 32% in January 2010. Faruki falsely represented that he "used [his] own dough first" and that his track record would be audited by RSM McGladry, Inc., a reputable accounting firm. Faruki said "I think you will be impressed". RSM McGladry has confirmed that it was never engaged by Faruki, Neural Markets or the fund for any purpose.  Faruki also told Tishfield that had he invested in Neotick, Tishfield would have made many times his money. Faruki solicited Tishfield stating that he should not "miss out" on this new opportunity.  Upon information and belief, Faruki's representations regarding the investment returns on Neotick were false as were the figures regarding the December 2009 and January 2010 performance of the fund.

30.     On January 27, 2010, the Illinois Securities Department charged Faruki with fraud in the sale of securities in violation of sections 12.F, 12.G, and 12.I of the

Illinois Securities Law (the "Logisol Matter").  A temporary order of prohibition was filed against Faruki and his company, Logisol, Inc., by the Secretary of State, State of Illinois Securities Department providing that:

> Pursuant to the authority granted by Section 11.F of the Act, respondents Belal K. Faruki and Logisol, Inc., their partners, officers and directors, agents, employees, affiliates, assessors and assigns are Temporarily Prohibited from offering or selling securities in or from this State until the further Order of the Secretary of State.

The order recited that an investor paid $150,000 to Logisol and Faruki in exchange for a note which provided for interest and other terms.  Faruki and Logisol paid $27,000 toward the debt and then failed to make any further payments.  The order charged that Faruki told the investor that "there would be no risk".

31.    Meanwhile, despite the Illinois temporary order of prohibition, Faruki continued his solicitations of Tishfield to invest in his fund, calling Tishfield repeatedly in January and February 2010 to tell him "how well my fund is doing."

32.    On April 14, 2010, a Notice of Hearing was issued in the Logisol Matter providing greater details. Specifically, the Notice alleged that Faruki, his wife, Samina B. Faruki, and Logisol, Inc., sold 75,000 shares of common stock in Logisol to an investor for $150,000. According to the Notice of Hearing, after receiving the funds, Faruki and his wife used the Logisol bank account to: pay personal expenses such as American Express credit card debts; transfer money to Neotick, Inc. (another Faruki entity, discussed above) and Samina Faruki; and remove money in cash. The State of Illinois Securities Department charged Faruki and his wife with fraud in the sale of securities in that they failed to notify the investor that they were converting the investment to their own personal use rather than using the funds to pursue Logisol

14

business.  Eight days later, the Temporary Order of Prohibition, relevant terms of which are cited above, was continued until the conclusion of an administrative hearing or entry of a final order in the case.

33.    This Order was in full force and effect until September 24, 2010 when Faruki paid the investor who withdrew his complaint. The Illinois Secretary of State thereupon dismissed the action and the ban was lifted. Defendants were aware of the Illinois ban and the solicitations to Tishfield in violation of the prohibition.

34.    Notwithstanding the Illinois ban, the solicitations continued. On or about August 25, 2010, Faruki sent a number of documents to Tishfield including Neural's promotional materials. In an email cover note, Faruki wrote that "Neural is now accepting managed accounts in the month of September" for commencement of trading in October. Faruki represented that Neural's systems employ: "almost zero leverage;" "high-frequency statistical arbitrage;" and "living models that self-adjust to keep up with dynamic markets;" and also "execute[] almost 100 trades per day with a win/loss ratio of 67.32%;" has "returned over 200% since inception in March 2009;" utilized "proprietary computer algorithms that exploit price imbalances based upon mathematical theorems;" and that the fund provides "daily liquidity to the client – funds are available every day prior to the close of the markets."  These representations were all false and fraudulent.

35.    The Neural marketing materials contained additional misrepresentations. The materials represented that the fund "is sector agnostic, very liquid and employs little to no leverage."  Similarly, Portfolio Characteristics were said to include "Sector-agnostic long-short market exposure to a portfolio of only the most liquid ETFs," (exchange traded funds).

36.     In a similar vein, Faruki represented to Tishfield that Neural was trading ETFs through an automated "no-touch" system with no human intervention which "goes flat" at the end of each trading day, meaning that no positions are carried over night. The marketing materials claimed that Neural used a quantitative approach to all trading strategies "predicated purely on the existence of a mathematically dominant behavior." Faruki claimed to have "proprietary, recursive, time series data mining over billions of data points", and utilize "Predictive analysis" and a "Proprietary modeling calculator." Faruki claimed that Neural would "report performance metrics on an hourly, daily, weekly or monthly basis" and repeatedly emphasized that there was "little to no use of leverage." Faruki claimed that he had a "proprietary, low latency platform and toolset incorporating the computing performance and data management necessary to screen, facilitate and execute our strategies." Faruki claimed to employ "exhaustive statistical/mathematical processing" and that the Neural utilized a "low risk, low volatility trading program." These claims were false.

37.     The marketing materials stated that Neural was funded through a "substantial investment by the firm's founder [Faruki] and affiliated team members." The materials stated that the fund "was launched in March 2009 and has returned in excess of 230% since inception." The materials represented that "at the core of Neural Markets is a development team with diverse backgrounds in physics, applied mathematics, network engineering and software development." The materials claimed that Neural's Chief Operating Officer ("COO") was Jay S. Sorkin, (part of the so-called "team"), a noted and distinguished professor and trader who has been a member of the Chicago Board Options Exchange and Chicago Board of Trade for over 25 years. Upon information and belief these statements were false. Sorkin held no office with and was not employed by Faruki or Neural.  Mr. Sorkin had a single, brief telephone call with Faruki which

16

was little more than an expression of interest. Sorkin provided no photograph to Faruki. Sorkin had no part (and was to have no part) whatsoever in the design or creation of the trading platforms or models or have anything else to do with Faruki's trading of the assets in the fund. There was no "team" with the educational and experiential backgrounds described in the materials. Mr. Sorkin had no knowledge that his biographical materials were included in Faruki's materials and never assumed the COO position at Neural. The claims and representations in the materials were materially false and misleading.

38.     The marketing materials also claimed that Neural's broker relationships were with TradeStation Prime Services and JP Morgan securities; that it was represented by Foley and Lardner; and that its auditor was RSM McGladry. JP Morgan securities confirmed that it never had any prime brokerage or other business relationship with Faruki, Neural Markets or Evolution funds. Although TradeStation brokerage accounts were opened in October 2010, no such accounts existed at the time of the publication and dissemination of the marketing materials. RSM McGladry has confirmed that it was never engaged by Faruki, Neural or Evolution funds. Finally, defendant Hopkins was identified by Faruki as corporate counsel and has acted for Faruki and Neural, not Foley and Lardner.

39.     The marketing materials were slick and largely, if not entirely, fabricated. There was no Neural fund as described or any such returns. Faruki does not have a college degree. He told one solicited potential investor, falsely, that he was graduated from Boston College and stated elsewhere in web-based marketing materials that his education was at University of Illinois. To further buttress Faruki's false marketing materials, Faruki told Tishfield that Neural's purported models were updated daily by his staff of 3 to 4 individuals holding Ph. D.'s in math and physics. Faruki also said that he held monthly contests amongst his Ph.D. model

developers, awarding a large cash bonus to the individual providing the best idea for improvement. These assertions were simply fiction.

40.     These marketing materials were provided to Tishfield on or about August 25, 2010, during the time the State of Illinois had barred "Belal K. Faruki and Logisol, Inc., their partners, officers and directors, agents, employees, affiliates, assessors and assigns . . . from offering or selling securities in or from" Illinois. Neural's corporate counsel, Hopkins, was aware of this prohibition and, as Faruki's partner in Neural, was actively involved or complicit in the preparation and circulation of these inaccurate materials. Similarly, the other defendants were also either actively involved or complicit in the preparation and circulation of these inaccurate materials in contravention of the Illinois bar.

41.     On August 31, 2010, Faruki again wrote to Tishfield, representing that "August turned out to be a very profitable month" for Neural. Faruki claimed that "August booked a total return, net of fees and commissions of $237,029.59 for a total return of 4.74 % over a trading period of 20 days, 4 hours and 54 minutes averaging .23 % per trading day." Faruki represented that "no leverage was employed this month." Faruki further represented that "the profit of $237,029.59 (4.74%) will be swept to a holding account for further distribution to investors and the account balance will be reset back to $5,000,000 for the month of September." Faruki claimed that the "next account reset" is scheduled for September 30, 2010. These and other representations in the e-mail were false. There were no "investors;" Faruki did not have $5,000,000 under management in Neural; and the purported returns did not exist.

42.     In August and September 2010 and thereafter, Faruki told Tishfield that he was managing $5,000,000 in investor funds and that Faruki had a "large amount of his own money in the fund." These statements were false. Faruki further claimed that he was marketing his fund to

a wealthy Saudi and that Faruki was travelling very frequently to Saudi Arabia. Faruki claimed

that the Saudi was prepared to invest $250,000,000. Faruki told another prospective investor that

he, Faruki, was quite wealthy and that his uncle is the Chief Justice Minister in Pakistan and that

Faruki stands to inherit "many more millions from him."

43.     Also in August and September 2010 and thereafter, Faruki told Tishfield that any

references to simulated trading in the marketing materials were to protect the confidentiality of

his wealthy investors whose money he was already managing and that his trading of actual funds

mirrored the strategies described in the marketing materials.

44.     Faruki called and wrote to Tishfield throughout the month of September 2010

imploring him to authorize necessary documents and wire money so that Tishfield would not

miss the "opportunity" to invest in his fund.

45.     On or about September 1, 2010, while the Illinois ban was in full force and effect,

Faruki sent Tishfield a Private Placement Memorandum for Neural Markets, LLC Evolution

Quantitative 1X Fund (hereinafter "the PPM") in order to solicit Tishfield's investment in

Neural. The PPM identified the "Fund Type" as "Hedge Fund, Proprietary Trading Firm." The

PPM identified the fund as the Evolution Quantitative 1X Fund; identified the Manager of the

fund as Neural (Del); and Faruki as the Manager of the Manager.  In that capacity, the PPM said,

Faruki had "overall responsibility for managing and administering the business and affairs of"

Neural and the fund. The PPM further represented that Faruki had control over the operations

and trading of the fund.

46.     The PPM represented that "the Fund applies quantitative and mathematical

models that buy and sell, short and cover listed securities as the automated systems discover

price imbalances and profit opportunities in the markets.  All trades executed by the Fund will be

19

automated and computer generated and will account for 100% of the investment decisions made. Except under extraordinary circumstances will non-computer based trades be generated." The PPM defined algorithmic trading and stated that such is "widely used by hedge funds, pension funds, and other institutional traders to generate and execute orders automatically." The PPM represented that "algorithmic trading will be used for all investment strategy and decisions" and that "investment decisions and implementation will be automated….[and] computer driven." The PPM falsely claimed that RSM McGladry was the auditor for the fund and that the prime brokerage account was with JP Morgan securities. The PPM also represented that "all accounting matters" of the fund will be "outsource[d]" to the Fund Administrator, Liccar CPA. These and other like representations were false. The PPM identified Foley and Lardner, LLP as "General Counsel." Upon information and belief, this representation was also inaccurate.

47.    In addition to the reporting representations Faruki made to Tishfield, detailed herein, the PPM also represented that the Neural fund would provide substantial reporting. Specifically, the PPM stated that within 7 days after the end of each calendar month the fund would provide an unaudited statement of each Interest Holder's Capital Account and Allocation Layer NAVs. (An Interest Holder is described elsewhere in the PPM as an "investor.") The PPM represented that within 30 days after the end of each calendar quarter the fund would provide an unaudited statement of each Interest Holder's Capital Account and Allocation Layer NAVs. The PPM represented that the Neural fund would provide to each Interest Holder within 30 days after the end of each calendar year: audited financial statements for the fund for that year; a statement showing the capital appreciation or depreciation for that year; the Interest Holder's Capital Account, by Allocation Layer, and the percentage interest thereon, as of the end of such year; and the Interest Holder's Schedule K-1. The fiscal year of the fund is the calendar year.

48.     These reporting provisions were grossly violated. On December 8, 2010, defendants provided Tishfield with a trading statement ending October 31, 2010. No other statements have been provided despite repeated requests.

49.     That same day, Faruki asked Tishfield whether he had received Faruki's purportedly sent emails containing daily performance figures. Tishfield did not. Faruki stated that "we had a great month in July and August" and that "you should start getting daily performance reports at 4:00 pm. EST."

50.     On September 3, 2010, Faruki notified Tishfield that as of September 1, 2010, "Neural Markets added the Evolution 4x Fund which 'employs up to 4x leverage.'" Faruki stated that the fund would have a minimum subscription amount of $5,000,000; that the fund would share certain characteristics with the Evolution Quantitative 1X Fund; and that quarter hour, hourly and daily updates would be available via email to clients interested in viewing the real-time performance of this fund. On or about September 5, 2010, Faruki communicated to Tishfield that he wanted to "formalize a PPM" and requested that they "finalize this transaction in time to start trading by 10/1/2010." Faruki insisted that he and Tishfield meet very soon because he did not want Tishfield "to get closed out" of the fund since "other investors were about to take up all of the available capacity." These statements were false. That same day, Faruki sent an e-mail with proposed terms describing Tishfield as an "investor."

51.     On September 6, 2010, in continuing violation of the Illinois ban, Faruki, Tishfield and defendant Barry met at the Soho Grand Hotel in Manhattan and discussed proposed terms for Tishfield's investment and other matters. Faruki explained that he was making so much money in the fund and had so much free money to invest that he wished to diversify and buy hard assets like real estate. Faruki stated that he had been downtown with real estate brokers

21

looking at loft apartments in Tribeca. On that occasion and others, Faruki claimed to Tishfield that he spends a few months per year in Oahu, Hawaii and owns a condominium there. Faruki also said that he frequently flew to Hawaii on a private jet. Faruki also boasted of owning several Ferrari automobiles, Lamborghinis and other expensive automobiles and buying his wife very expensive and lavish jewelry. At the time these statements were made, Faruki had not paid his mortgage in at least eight months (at approximately $2,722.87 per month), and Deutsche Bank, the mortgage holder, had filed a foreclosure action. *See Deutsche Bank v. Belal Faruki*, 10-cv-5291 (N.D. Ill.).

52.     During the meeting in New York City, Faruki aggressively solicited Tishfield stating that Tishfield needed "to commit in the next day or two or it would likely be too late." At the meeting, Faruki stated that he had a substantial amount of his own money invested in the fund. Barry, in order to induce Tishfield, said that he was investing in the fund as of October 1, 2010. Barry said that he had invested with Faruki in several deals and that he had made a lot of money in those investments. Faruki stated that "we have been killing it," and suggested that no other fund had these kinds of returns. Faruki said that "I am making my investors rich." Separately, Faruki told Tishfield that Barry had invested in the fund. Upon information and belief, these claims of wealth and investment returns were false.

53.     On September 8 and 9, 2010 Faruki circulated signature pages to Tishfield for the Neural Markets Evolution Quantitative 1X Fund. The date of the PPM is September 1, 2010. Tishfield was solicited to sign the PPM and did so on September 8, 2010, but did not transfer any money. On or about September 14, 2010, Tishfield questioned Faruki about an Illinois lawsuit in which Faruki was named. Faruki lied about the lawsuit explaining to Tishfield that he appreciated it being brought to his attention but that he often gets named in lawsuits because of

his service on many corporate boards. Indeed, Faruki falsely stated that "I did not even know I was sued." Faruki assured Tishfield that there was no lawsuit, proceeding, or other reason for Tishfield to harbor any concerns.

54.    In furtherance of the scheme to defraud, on September 13, 2010, Faruki asked to meet Tishfield again in Manhattan to discuss the PPM and the fund. Faruki also sought to solicit Tishfield's brother-in-law to invest. At Faruki's request, Tishfield sent a copy of the Neural marketing materials to his brother-in-law in advance of the meeting. Tishfield, his brother-in-law, and Faruki met in Manhattan on September 16, 2010 at 800 Third Avenue, New York, New York. Faruki was late to meet Tishfield explaining that, again, he was with his real estate broker looking at lofts downtown to purchase. Faruki also said that he had met with JP Morgan and TradeStation in New York about his clearing and commission rebate arrangements. During the meeting, Faruki solicited Tishfield and his brother-in-law to invest. Faruki made several false representations both orally and in writing to Tishfield and his brother-in-law. Faruki told Tishfield that he would be personally overseeing the fund and the trading in the accounts for the investors. Faruki stated that he currently had $5,000,000 under management from several wealthy investors. Faruki was asked for their names for due diligence purposes but declined to disclose them claiming privacy concerns. Faruki said that defendant Hooper was one of his "rich guys" and an "investor."

55.    Faruki discussed with Tishfield and his brother-in-law the claims made in the Neural marketing materials and elsewhere as described above.  Faruki's representations were false. Contrary to Faruki's various false representations at the meeting, there were no other investors and Faruki did not have $5,000,000 from several wealthy investors in assets under management which he was trading and was not obtaining the returns described. Faruki also

promised that he would keep Tishfield updated daily on the performance of the fund by giving him the ability to track real-time gains and losses. Faruki never provided access to the daily performance.

56.     Just three days before this meeting, on September 13, 2010, Neural's corporate counsel and equity partner, defendant Hopkins, was arrested and charged in a criminal complaint. *See United States v. Mark Hopkins, et. ano.*, 10-cr-753 (N.D. Ill.), Complaint attached as Exhibit C. Hopkins was implicated in a mortgage fraud "double closing" scheme. These charges, which were never disclosed to Tishfield, are pending.

57.     On September 19, 2010, Faruki circulated an e-mail claiming that the "1X portfolio is up a total of 2.42%." Faruki stated that he, the "Managing Member," made "specific changes to the portfolio" of securities traded. Faruki's signature on every one of his e-mails described him variously as the "Managing Member" or "Portfolio Manager" of Neural. Faruki also claimed that, "due to popular demand" he was considering "re-opening" a Forex trading fund to "new subscriptions from Qualified Investors."

58.     On September 23, 2010, Faruki communicated to Tishfield that he was coming to New York City to meet with more investors. Faruki also sent Tishfield "Exhibit B" to the PPM, which purported to be a disclosure statement of Faruki's "Past and Pending Litigation." Faruki claimed that "TradeStation is requiring me to have all investors sign this document." Although they did not invest in the fund – Tishfield was Faruki's only investor - defendants Weilert, Hopkins and Barry each executed the Exhibit to give the appearance and impression that they were "investors." These documents were signed as follows: Weilert (September 6, 2010); Hopkins (September 7, 2010); and Barry (September 23, 2010). While they were equity owners of Neural, none of them invested in the fund. The signing of these documents was designed to

mislead Tishfield into believing that the fund actually existed and that other investors,

individuals close to and knowledgeable of Faruki, including his corporate counsel, Hopkins, had

decided to invest.

59.     The assertions contained in "Exhibit B" were misleading.  Defendant Hopkins'

signature of September 7, 2010, representing that the Deutsche Bank matter was "Dismissed in

entirety" predates the actual dismissal of that lawsuit. Hopkins' September 7, 2010 signature,

representing that the Logisol Matter was "Settled, Pending Dismissal," is also not true. The

Logisol Matter was not settled until the morning of September 24, 2010 when Faruki apparently

paid off the plaintiff. Moreover, Exhibit B's statement that the Roy E. Harris matter was

"Settled, Dismissed in entirety" was false. In fact, Harris, acting on behalf of the CFTC, obtained

a default Order against Faruki and he was ordered to pay reparations. Hopkins'

misrepresentations are particularly noteworthy since he was described in Faruki's emails as

Neural's corporate counsel and he had represented Faruki in legal actions as far back as at least

September 2006.  Defendants Barry and Weilert also made and endorsed these

misrepresentations.

60.     The assertion that "Exhibit B" constituted "Disclosure of Past and Pending

Litigation" was also not true. Faruki, counsel Hopkins, and defendants Barry and Weilert, failed

to disclose at least four other litigations as well as a past misdemeanor conviction of Faruki

involving a bogus check. Aside from Exhibit B, the PPM also failed to disclose that defendant

Hopkins had just been arrested and charged with bank fraud in violation of 18 U.S.C. § 1344.

The PPM also failed to disclose at least one prior lawsuit against Hopkins for misappropriation

of client funds. *See* Exhibit B, annexed hereto.

61.     There were other false and misleading assertions in the PPM. The PPM claimed

that a law firm, Foley and Lardner, was involved in the creation of the PPM and was counsel to

the fund.  On information and belief, that representation cannot be true unless Foley and Lardner

did not understand that Faruki would market and solicit investors prior to the ban being lifted, in

which case they would have been deceived by Faruki and his co-conspirators as well. Further,

Hopkins is identified as the agent for Neural, not Foley and Lardner, and Faruki described

Hopkins as Neural's "corporate counsel." Upon information and belief, Foley and Lardner were

not counsel to Neural or the fund.

62.     On September 24, 2010, Faruki claimed to Tishfield that he needed a letter of

recommendation "to fulfill the due diligence requirements of a potential fund investor." Barry

drafted a sample of such a letter touting Barry's experience as a Vice President at Barclays

Capital.  The letter claimed, *inter alia*, that Faruki "consistently demonstrated honesty [.]" When

Barry made this statement, he was improperly working outside of his employment at Barclays

Capital and, upon information and belief, was violating his employment agreement and the

policies of the bank.  The email from Faruki attaching Barry's alleged "draft" letter requested

similar letters from each of the cc'ed "partners" – including defendants Hopkins, Hooper, and

Weilert.  Hopkins wrote such a letter on behalf of Faruki.

63.     On September 27, 2010, Faruki claimed that the Fund was up .72% in one week.

He also promised Tishfield in writing that once he received an executed "Subscription

Agreement and funds on deposit" from Tishfield, defendants Hopkins and his law firm would

transfer a 1% equity interest in Neural to Tishfield for one dollar and mail certificates of

ownership to him.  Tishfield never received the 1% promised equity interest.

64.     That same day, Faruki instructed Tishfield to wire his investment "for the EVO1X

fund" to an account number ending in 2548 in the name of Neural Markets, LLC at JP Morgan Chase Bank, NA. Unbeknownst to Tishfield, this was an account of Neural (IL). Faruki stated that once the funds are received, Liccar, CPA will contact Tishfield. Faruki claimed that "Liccar is the fund administrator and they will be managing subscriptions, redemptions, reporting, etc for your account with Neural." This never happened. In contravention of the specific representations of the PPM and these additional representations, Faruki maintained all of the accounting and reporting information. By December 10, 2010, Liccar had resigned.

65.     In a BBIM conversation on September 28, 2010, Tishfield asked Faruki about the performance of the $5,000,000 in investor funds Faruki told Tishfield he was managing. Faruki responded that the market and other factors were affecting all of his returns including ". . . 5 m simulation, 5 m real . . ."

66.     Based upon the above written and oral representations made by the defendants, and the material omissions made by defendants, Tishfield, on September 28, 2010, wired $1,000,000 to the designated Neural (IL) account. That same day, Tishfield asked Faruki "what [has] the performance been on the $5M account you have been trading of your dough and your partners dough? That is live, correct?" Faruki responded "we are up an average of 7% for this month... that's with 3-4x leverage." These assertions were all false. Faruki was not trading $5,000,000 and his claimed returns were invented.

67.     On October 5, 2010, Faruki emailed Tishfield a "summary" of trading for the day. The "summary" states initial capital of $5,000,000, an opening balance of $5,070,684 and a current balance of $5,053,491.88. These averments were false. There were no other investors other than Tishfield. Faruki only had Tishfield's $1,000,000 investment.

68.     Two days before, on October 3, 2010, Faruki advised Tishfield that "the TradeStation account is not open yet" and that TradeStation Securities, Inc. ("TradeStation"), a brokerage firm and trading platform, "does not like our fund documents as is." Faruki stated that "we have to submit additional documentation for the fund" to TradeStation "before the account will be opened" and "make some changes and resubmit." Therefore, "we might miss the first week of octobers trading." Upon information and belief, TradeStation had rejected an application to open an account by the Manager, Neural (Del), and/or any entity associated with Faruki, the Manager of the Manager. This rejection and the true reasons for it were not disclosed to Tishfield.

69.     On October 5, 2010, defendants Weilert and Barry, acting in concert with the other defendants, created Evolution. Defendants thereupon transferred Tishfield's $1,000,000 from the Neural (IL) account to an account in the name of Evolution Quantitative 1X, LLC ("Evolution"). Evolution received the deposit of Tishfield's money on October 6, 2010. On that date, Faruki advised Tishfield that "all the revised documents were submitted to tradestation today and we should have the evo1x account opened" in the next day or so. Faruki further stated that "[w]hen the account is opened I will transfer the customer funds, including yours and trading will start." Unbeknownst to Tishfield, the TradeStation account application document was not merely "revised," nor was "additional documentation" submitted. Rather, upon information and belief, defendants engaged in a scheme to deceive TradeStation as to the true manager and control person on the account – Faruki. Faruki's statement, "…the customer funds, including yours" furthered the deception of Tishfield that Faruki was managing other investor's funds.

70.     On October 8, 2010, defendants dissolved Neural (IL). Tishfield had no knowledge that Neural (Del), the entity he contracted with, never received his money. A new

LLC entity, Evolution, now held Tishfield's money. The members and owners of that entity were Weilert and Barry. Upon information and belief, Faruki was nowhere identified with Evolution.

71.     Upon information and belief, defendants created Evolution as part of a conspiracy to deceive TradeStation and Tishfield and violate the PPM. This deception served two purposes. First, upon information and belief, defendants opened a TradeStation account under Evolution falsely omitting that, in fact, Faruki was controlling Evolution and managing its trading and assets. In an e-mail dated October 3, 2010, Faruki confirmed his control over the account telling Tishfield that "I will start trading your funds once the account is opened."

72.     To do so, upon information and belief, defendants falsified account applications submitted to TradeStation which specifically requested the names of any and all control or associated persons with Evolution. This was done in order to conceal Faruki's ownership, control and management of Evolution. On information and belief, defendant Barry furthered this deception by communicating with TradeStation through his Barclays Capital email address, to wit, James.Barry@barclayscapital.com.

73.     Upon information and belief, defendants also engaged in this deception in order to disguise the fact that Evolution, through Faruki, would be trading futures with investor, customer or third party money in violation of CFTC rules and regulations. Upon information and belief Evolution, a corporate entity, was presented to TradeStation as an entity holding corporate money rather than pooled assets or managed money. In addition, on information and belief, defendants falsely denied, in TradeStation applications, that Evolution held or would be trading "customer funds" or solicited investor funds. Upon information and belief, defendants falsely averred in response to TradeStation application questions that all Evolution funds were not solicited from third parties and that no third party or "customer" had any interest in the funds.

74.     In doing so, defendants circumvented the requirement that to trade futures with third party or "customer" money, the entity or the persons associated with it register with the CFTC's Self Regulatory Organization ("SRO") as a CPO ("Commodity Pool Operator"), or a CTA ("Commodity Trading Advisor") or file electronic exemptions as required. The defendants were required to register with the CFTC via the National Futures Association ("NFA") and otherwise comply with various filing requirements and exemption requests. They did not do so and were thus not permitted to trade Tishfield's money in futures.

75.     Faruki's futures trading violated his prior representations, marketing materials and the PPM, all of which asserted that Tishfield's money would be invested in a 1X fund with computerized, "hands off" algorithmic trading utilizing "almost zero leverage." The materials and Faruki also represented that positions would not be carried overnight. The trading Faruki conducted, including the futures trading at TradeStation, which utilized over 7 times leverage (7X), was grossly inconsistent with these representations and, upon information and belief, caused significant losses.

76.     Defendants concealed from Tishfield the following: the deception of TradeStation; the fact that Tishfield's funds were never sent to the Manager, Neural (Del); that the creation of Evolution was designed to deceive TradeStation; that defendant Barry was presented to TradeStation as the account manager, trader or control person; the concealment from TradeStation that, in fact, Faruki was still controlling, managing and trading the account; the concealment from TradeStation that the account contained "customer funds."

77.     On October 18, 2010, Faruki informed Tishfield that trading commenced using TradeStation. Tishfield asked Faruki whether Liccar & Company (the fund's administrator) was going to give him "access to view and confirm [investments], etc.?" Faruki responded "Yes."

30

That never happened. On October 20, 2010, Liccar sent a letter "acknowledging receipt" of Tishfield's "initial investment in the amount of $1,000,000 in the Neural Markets Evolution Quantitative 1X Fund." Liccar noted that "this transaction will be reflected on your monthly investor statement."

78.     Between October 18, 2010 and November 3, 2010 Tishfield repeatedly requested to see daily trade logs, confirmations, trades and or reports.  Faruki variously ignored Tishfield's requests; blamed the lack of paperwork on Liccar & Company; and just told Tishfield that the information "is forthcoming."

79.     On November 2, 2010, Faruki told Tishfield that the net loss for October was less than 1%. This assertion was false. The actual loss in October was more than six times greater. Faruki furthered the deception by falsely telling Tishfield, that same day, that the fund is "up 2.3% so far." Faruki also told Tishfield that the "accounts were just above break even." These false statements were designed to induce Tishfield to remain invested and not learn of Faruki's deception.

80.     On November 3, 2010, Faruki stopped trading the fund (which only contained Tishfield's money) due to a dispute with TradeStation.  Faruki informed Tishfield about the dispute but told him "not to worry" because the fund was above start-up.

81.     Beginning on or about November 3rd and continuing throughout December 2010, the defendants misled and deceived Tishfield claiming that a supposed "error" on the part of TradeStation was responsible for significant losses in the fund.

82.     On November 8, 2010, Faruki falsely told Tishfield that there was a significant trading error with TradeStation that was "in our favor" and that TradeStation owed the fund money.

31

83.     On November 9, 2010, TradeStation's general counsel wrote to defendants Barry

and Evolution (notably neither Faruki nor Neural was a recipient of the letter) stating in part that

the alleged "errors" resulted "in a profit that was credited to your account of $21,000 less

commissions and other fees." As the TradeStation letter reported, "Your [Barry's] arguments,

however, are not persuasive since they are being made with the benefit of hindsight as to how the

markets moved on Friday, November 5th. I doubt that you would have complained had the

market moved in the other direction." The letter went on to say that "TradeStation has made a

business decision to ask you to transfer your equities and futures accounts to another broker

dealer. We will code your account for liquidations only beginning November 10, 2010 at 4:00

PM ET for your equities account and 5:00PM ET for your futures account." Faruki falsely

reported to Tishfield that "it's a 150k error on their part."

84.     On November 15, 2010, Tishfield once again asked Faruki "what are the

balances/performance in my account since trading was halted?" Faruki responded that the fund

is "not back to break even yet" falsely blaming the (as yet unspecified) loss on the dispute with

TradeStation. Faruki also falsely stated that Liccar held the account information. Specifically,

Faruki stated that, "We should have octobers numbers from liccar any day now and will have

novembers numbers after the end of the month.." In fact, as Liccar reported to Tishfield, Faruki

held all of the account information.

85.     Faruki then falsely claimed that the fund had filed an arbitration claim with the

NFA over the supposed TradeStation error. Faruki falsely told Tishfield that he had hired a

noted Chicago law firm for $50,000 to represent the fund against TradeStation and that the

arbitration was scheduled for January 6, 2011. The NFA has confirmed that no such arbitration

claim was ever filed.

86.     On November 16, 2010, and thereafter, Faruki and Tishfield had discussions and emails about the fund. In these various communications, Faruki falsely told Tishfield that as of November 3, 2010, the fund was flat absent the claimed "error" by TradeStation; that the error was $57,000; and that only 1/3 of that error impacted upon Tishfield because there were three investors in the fund. Faruki also claimed that the fund would be up about 10% after he "re-captured" the supposed TradeStation error, which he now claimed was $278,000. Faruki also claimed that TradeStation was illegally trading currency futures and that TradeStation was improperly taking commissions on equity trading (which Faruki claimed would be rebated), all of which further negatively affected the fund's value. Faruki stated that "TradeStation did not credit Evolution any rebates for the liquidity added" and claimed that this had a negative impact on the fund's value. Upon information and belief, these statements were all false.

87.     Upon information and belief, Evolution was not structured to be eligible to receive such rebates and thus Faruki's claims of rebate entitlement were false.

88.     Faruki claimed that his legal counsel was preparing for the NFA arbitration and that his counsel said that the arbitration claim was a "slam dunk winner." Indeed, Faruki stated that "[r]egarding the pending matter before the NFA, once that matter has been resolved either to the benefit of the fund or not, the fund administrator will be reporting the results in that months report." Tishfield requested "the tradestation/nfa arbitration documents" to review. None were ever forthcoming. All of these statements by Faruki were utterly false and fraudulent. No NFA arbitration claim was ever filed or received by TradeStation.

89.     Faruki also said that defendant Barry was dealing with TradeStation on these issues. Tishfield was surprised by this and wrote to Faruki stating that, "you had mentioned the other day that technically he [Barry] has authority over the account along with you...I am very

33

confused and trying to sort this out." Tishfield asked Faruki to have Barry call him. Tishfield also called Barry directly and left messages for Barry to call. Barry never did.

90.     On November 17, 2010, Tishfield e-mailed Faruki confirming the nature of their conversation and raising questions about Faruki's claims. Later that evening, after not receiving an answer from Faruki, Tishfield advised Faruki to resolve any discrepancies before resuming trading. Faruki responded that he had spoken with his legal counsel and that they had advised Faruki not to stop trading as it could negatively affect returns. Faruki responded that there were "other investors," that he had his own money in the fund, his partners' money in the fund, and that segregating Tishfield's money and ceasing trading would be "unfair" to all of these investors. Faruki's statements and representations were false and fraudulent. Faruki did not have other investors in the fund and did not have his own money in the fund. The only money in the fund  - just the Evolution account at TradeStation  - belonged to Tishfield. Tishfield and Faruki had a number of conversations about these events in which Faruki falsely stated that he was discussing them with the "other investors."

91.     On November 19, 2010, Tishfield requested daily trading and/or a performance report. Tishfield commented that Faruki had provided trading information prior to his investment but "there is a reluctance now that I have an actual account opened." Faruki responded that "I understand your concerns. I will get back to you over the weekend with more details for you. There is no reason for you to be concerned. Nothing catastrophic has happened. I just need some time to get this dispute resolved with TS [TradeStation]."

92.     The concocted "dispute" with TradeStation had nothing to do with losses in the fund. Faruki was deceiving Tishfield to cover up the defendants' actual trading activity which was inconsistent with the defendants' prior representations including their false statements of

34

positive returns.  All of the defendants, either directly or as members of Evolution or Neural, were aware of this deceit.

93.    On November 18, 2010, Tishfield, in a series of e-mails, requested the "daily performance data" he and Faruki had long discussed. None arrived. The following day, Faruki claimed that he began trading with Interactive Brokers.

94.    On November 23, 2010, when Faruki failed to respond to Tishfield after the weekend as promised, Tishfield contacted the fund's administrator, Liccar & Company, to supply him with account statements and reporting on his investment. Liccar responded that the October financials "are currently in for review" and that Liccar "will have another update for you within a day or so."  Tishfield asked whether Liccar had "any sense what the delay is about for October statements?"  Liccar responded on December 2, 2010 that it had "a call into them to follow-up, will let you know just as soon as I hear back." Tishfield responded "I'm confused- a call into who?"  As noted, Faruki (and the PPM) had always represented that the fund administrator kept all of the balance and account information. Those representations were false. Liccar told Tishfield that Faruki had all of the trade details and information and that Faruki demanded to sign off on everything Liccar sent out.  On November 30, 2010, Faruki reported that "all is okay" with the fund. Aside from those words, as of December 6, 2010, no information on October trading (much less November) was provided. To date, Tishfield has received no trading or statement information for November or December 2010 trading activity.

95.    On December 6, 2010, Tishfield wrote to Faruki at length including the following: "We had been communicating quite frequently during the discussions/lead up to my investment with/in Neural Markets/Evolution funds but since I wired in the proceeds in late September and trading began, I feel like you are being a little evasive regarding many aspects of our deal,

35

understanding and my investment.....You spoke about giving me an id and password to
TradeStation where I could view the trading and result on an hourly, daily, or weekly basis, and
have web site access, etc.  Furthermore, you told me Liccar would be doing frequent and timely
performance reporting, but I would also be getting automated daily email performance reports
similar to what you had been sending me during the evaluation period.  However, it is now
December 6, I have not been able to see any results at all, have no information on my account, no
. . . information of the fund, etc." Tishfield also expressed that "when we last spoke....you
mentioned about the account management and account oversight being with Jim Barry and
technically not with you, has introduced some concern and raised questions I would like
answered. I even emailed Jim a couple of weeks ago and he did not respond either."

96.     Faruki did not respond to Tishfield in writing. Instead, he called Tishfield,
admitted that he had misled Tishfield with the "all okay" statement on November 30, 2010, and
stated that, in fact, the fund was down. Faruki then falsely claimed that the losses resulted from
at least three factors. Faruki first blamed TradeStation, claiming that the firm changed its back
data so that Faruki's "correlation models" broke down. Faruki said that his "correlation model"
was causing losses all along and that he just realized the error. Faruki, however, could not
explain how this could happen when he had all along represented to Tishfield that his models re-
calculate correlations and patterns every night and that his models use multiple data sources.
Second, Faruki claimed that TradeStation owed the fund commissions and rebates which it
refused to pay resulting in a negative impact on returns. Faruki also claimed that the so-called
TradeStation "error" negatively affected the fund's performance.  As a result of these events, so
said Faruki, the fund was not flat up to 10% as he had previously advised, but down 25%.  Faruki
then claimed that the fund was up "3 ½ to 4% through December" and that since the Fund moved

from TradeStation (Faruki failed to mention that TradeStation expelled the fund) to Interactive Brokers, the fund was "making money just about every day" and that less than 50% of the equity in the fund was invested. Faruki's claims concerning the reasons for the losses and the recent supposed gains were all false and fraudulent.

97.     Faruki also claimed that the fund's "other investors" were aware of these circumstances and he was communicating with them about the TradeStation and other issues negatively affecting performance. Since there were no other investors, this statement as well was false. Faruki made these statements in order to fraudulently induce Tishfield's continued investment and conceal Faruki's prior misrepresentations.

98.     On the morning of December 8, 2010, Faruki falsely claimed that the TradeStation "error" matter was "still pending before the NFA" and that its resolution would impact the Fund's value. This assertion was false. Faruki continued to falsely claim that TradeStation's alleged failure to credit "any rebates for the liquidity added" negatively impacted the fund. Faruki also claimed that the fund upgraded its software and that this "somehow affected performance or reporting."

99.     Later on December 8, 2010, Faruki informed Tishfield that as of December 1, 2010, there was "around $766k" in the fund and as of December 7, 2010 there was "around $746k" in the fund. Faruki stated "these numbers are unaudited, not confirmed by Liccar. I cannot make any guarantee that these numbers are accurate." Liccar had already made clear that Faruki held all trading and balance information.

100.    In response, Tishfield told Faruki that he was very concerned. "When we last spoke two nights ago, you had said you were recovering from several errors and in fact the fund was up 3 ½ % to 4% through December. Also, you had told me that since your move from TS to

37

Interactive Brokers, you were making money just about every day.  These returns and changing

stories cannot keep happening.  This is starting to look and smell very bad and sounds like you

are trading to cover-up previous losses that have been severely deviating from your advertised

strategy."

     101.    Faruki responded that "you have too many questions" and falsely claimed that

Liccar & Company would do the reporting on the fund because that is "outside the scope of what

I am trying to do which is let the information flow once through the Fund Administrator." In

fact, Faruki held the accounting details and trade information. Faruki was lying again. Tishfield

demanded daily reporting into December. None was received.

     102.    That same day, on December 8, 2010, Liccar & Company sent an investor

statement to Tishfield for the month ending October 31, 2010.  According to the statement,

Tishfield's $1,000,000 investment lost 6.53% in one month and was down to $934,730.74. No

trade confirmations were attached and no trading activity was reported.  The statement simply

reported a monthly loss in October 2010 of $65,269.26.  There was no explanation or detail for

the reported loss.  Nor was there an accounting of any fees, expenses or other sums of Tishfield's

money that was removed from the fund.

     103.    On December 9, 2010, Tishfield demanded that Faruki immediately cease trading

his funds and provide an immediate and full redemption of his investment. In so doing, Tishfield

confronted Faruki with some of his recent fabrications: "the returns that you've been quoting me

on the phone are turning out to be massively different from reality and insanely poor.  Even as

recently as two nights ago, you told me the fund was up 3 ½ - 4% this month, yet today in

response to a direct question, you told me it was down 2% already this month.  This is horrible

and unacceptable…The returns are so bad, and the magnitude of the loss is so large, that it seems

nearly an impossible outcome to be down so much, since you claim to not use leverage on this fund; and you told me several times that the assets are less than 50% invested....I fully demand and expect a very quick return on my full one million dollars.." Tishfield also stated that Faruki engaged in "misrepresentations." Faruki did not respond to, much less contest, these accusations.

104.    Tishfield further stated to Faruki that "I have learned that you have been deceiving me on many fronts..." and demanded that Faruki reveal "how much cash [is left] and where exactly is the cash being held?" Faruki did not answer this question nor did he deny Tishfield's accusations. Instead, Faruki responded that he provided account balances yesterday, trading had been halted and that Tishfield's assets were in cash "in an account with Interactive Brokers." Tishfield again demanded a full redemption and demanded that Faruki send a screen shot of his Interactive Brokers balances or email him an account statement "which I am sure you have access to on-line." Faruki did neither. Tishfield asked Faruki, "How are you handling this with other investors" and "have you allowed any other investors to redeem" not realizing that Faruki had long deceived him about their existence.

105.    Later, Tishfield spoke to Liccar, whom, according to the PPM, was the fund administrator and thus responsible for "all accounting matters" including "NAV calculations, fee calculations and other pertinent accounting matters." Liccar confirmed that the company had no records, no information and any information they received was solely limited to what Faruki deigned to provide. Tishfield asked Liccar what the other Neural investors were doing and whether they were concerned. Liccar responded, "what are you talking about, you are the only investor." Liccar further advised that, contrary to all prior representations by Faruki and the other defendants, defendant Barry was not an investor at all but held equity shares in Neural/Evolution.

39

106.    On December 10, 2010, Tishfield demanded that Faruki return his money. Faruki

did not respond. Tishfield attempted to contact defendants Barry and Weilert. Faruki contacted

Tishfield and told him, "don't call Weilert, Jim Barry or Keith Hooper. They all know about the

issues. They know you are trying to reach them and they all do not want to talk to you."

107.    On December 11, 2010 Tishfield wrote to Liccar requesting that it send any

paperwork necessary to redeem his full balances in Neural. Liccar responded on December 13,

2010 that it had forwarded the redemption request to Faruki. Liccar further stated that its role

was limited and under the supervision of the fund's Manager, Faruki. Liccar had no

management, bank authorization or any other authority with respect to the fund. Liccar further

advised "on December 10, we tendered our resignation as administrator to the fund effective 30

days from the date of our resignation." Thereafter, Liccar advised that all inquiries were

forwarded to Faruki.

108.    On December 13, 2010, Foley and Lardner advised that Tishfield's funds

(roughly $750,000) were placed in a checking account at Chase Bank and that Belal Faruki was

not an authorized signatory on the account.

109.    On December 22, 2010, defendant Hopkins stated in a letter on his firm letterhead

that there was an approximate balance of $740,000 of Tishfield's money remaining that is

"subject to pending fees" and those funds are being held "in cash in a domestic account."

Hopkins refused to disclose the actual balance in the account, the account name and number,

where the account was located, or the name of the individuals with signing authority.  Nor did

the letter describe the nature, amount or entitlement to any such "fees." No other trading activity

information, account statements or fee detail was, or has been, provided.

110.    In subsequent correspondence, on December 28, 2010, defendant Hopkins stated
that Tishfield's actions "have forced the Fund to seek a new administrator and accountant." To
date, Tishfield has received no information from any "administrator" or "accountant." It thus
appears that no entity has sought or obtained an administrator or accountant. In that same
correspondence, defendant Hopkins threatened to take more of Tishfield's money citing to the
PPM. Hopkins was clearly advised that no Tishfield funds could lawfully be withdrawn for any
purpose.

111.    On January 11, 2011, counsel for Tishfield offered a standstill agreement in
exchange for a commitment to identify and preserve Tishfield's funds. This offer was rejected. In
doing so, defendant Hopkins stated that, "no funds will be disbursed to Tishfield until the
conclusion of all pending regulatory inquiries and Mr. Tishfield will remain liable for all
accumulated costs incurred as a result of his actions." Hopkins suggested that Tishfield "focus
his efforts on assisting in dismissing the pending [governmental] action in Cook County" and to
"fully disclose" the other "regulatory and law enforcement agencies" Tishfield had contacted "to
avoid placing more [of Tishfield's] funds in imminent risk[.]" Stated very plainly, Hopkins
threatened to take Tishfield's remaining funds unless Tishfield interfered with ongoing
governmental inquires and shut them down. This extortionate demand was part of the ongoing
efforts to conceal defendants' fraud from Tishfield and regulators.

112.    On January 24, 2011, defendant Hopkins wrote again to reject the standstill
agreement. While he claimed that Tishfield had "already forced us into a defensive posture,"
Hopkins represented that "Neural has no desire to hold or spend Mr. Tishfield's money."

113.    Yet that same day, January 24, 2011, $100,000 of Tishfield's money was
transferred from an Evolution JP Morgan account to an account belonging to Hopkins and

41

Associates, P.C. Tishfield was not aware of and did not authorize the transfer. There was no lawful basis to take his money. It was plainly converted in the face of repeated demands that Tishfield's money be returned and promises that it would be preserved. Defendants Barry and Weilert created Evolution and Weilert, if not also Barry, is a signatory on that account. Weilert, Barry, Faruki and the other defendants permitted and authorized the unlawful transfer and conversion of Tishfield's money to Hopkins.

114.   Based on the fraudulent activity detailed above, on August 10, 2011 the SEC filed a sealed complaint in the United States District Court for the Northern District of Illinois against defendants Faruki, Neural Markets, the Quantitative Evolution 1X Fund and Evolution. *See* Exhibit A.

115.   On August 10, 2011, the district court granted the SEC's request for emergency relief including a temporary restraining order and asset freeze on all funds and assets of Faruki, Neural Markets, the Fund, and Evolution. *See* Exhibit A.

116.   The Court lifted the sealing order on August 29, 2011 and the preliminary injunction order was entered August 31, 2011. *See* Exhibit A.

117.   The SEC Complaint alleges, *inter alia*, that defendants Faruki and Neural (a) solicited highly sophisticated individuals to invest in the fund, which supposedly used a proprietary algorithm to carry out an arbitrage strategy involving trading in liquid ETFs and (b) falsely represented the existence of investor capital and that trading was generating profits when, in fact, losses were being incurred.

118.   In the wake of the SEC's filings, an apparently nervous Faruki made statements in the print media claiming, in complete contravention to the facts, that Tishfield is a partner in Neural. Faruki was quoted as claiming that "This partner has been blackmailing and attempting

to extort money from the other partners." Faruki also claimed to the press, falsely, that he was not operating a hedge fund or seeking clients; that he was not a "trader" but merely a "writer of software;" and that Tishfield was not an investor in the Fund, but a partner. Faruki was further quoted as saying that the Fund "was a partnership that never sought any business from clients…[the Fund was] a private company that did not want outside investors." Faruki also said, in direct contravention to the PPM and his own actions, that "we don't want to be a hedge fund."

119.    In addition, Faruki falsely told at least one reporter that "[t]he agreement he [Tishfield] signed is that we're partners and we all share equally in the gains and losses" an absurd proposition since Tishfield is the only person "sharing" in the losses. In other statements to the press, Faruki contradicted himself and clearly admitted that the only "victim;" the only "investor"; the only individual who lost money – was Tishfield. Aside from this admission, Faruki's claims in the press are demonstrably false through overwhelming documentary and witness evidence, constitute evidence of his continuing scheme to conceal defendants' fraud and defraud the marketplace and potential investors, and are slanderous as to Tishfield.

120.    The above allegations are offered in support of the following causes of action and are not intended to be an exhaustive recitation of all facts known to the plaintiff regarding the defendants' fraudulent activities.

## CAUSES OF ACTION

### COUNT I

**(Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10B-5
Thereunder Against Faruki, Hopkins, Hopkins and Associates, P.C., Hooper, Weilert
Investments, LLC, Barry, Weilert, Neural, 1X Fund and Evolution)**

121.    Tishfield repeats and re-alleges each and every allegation in this Complaint and in
the annexed Exhibits as if set forth in full herein.

122.    Defendants, individually and in concert, directly or indirectly, by the use and
means of instrumentalities of interstate commerce and the mails, engaged and participated in a
common plan, scheme and course of conduct described herein, pursuant to which they
knowingly or recklessly engaged in acts, transactions, practices and a continuous course of
business which operated as a fraud upon Tishfield; made various false statements of material
facts and omitted material facts to make the statements misleading to Tishfield; and employed
manipulative or deceptive devices and contrivance in connection with inducing Tishfield to
execute the PPM and invest in the fund.

123.    The purpose and effect of the defendants' plan, scheme and course of conduct was
to unlawfully induce Tishfield into investing in the fund and once his monies were invested
therein, to maintain his investment in the fund and conceal defendants' fraudulent activities from
Tishfield and governmental authorities. Defendants improperly obtained fees and other benefits
from Tishfield's investment including but not limited to diverting his monies to themselves.

124.    The defendants had actual knowledge of the material omissions and the falsity of
the material statements set forth above, and intended to deceive, manipulate or defraud Tishfield,
or, in the alternative acted with reckless disregard for the truth when they failed to ascertain and
disclose the true facts in the statements made by them.

125.   Tishfield reasonably relied on the statements and documents offered by the defendants in connection with his investment.

126.   Had Tishfield known that the information provided to him by the defendants was materially false and misleading and that defendants omitted material information, he would have never executed the PPM or wired $1,000,000 to defendants and an account controlled by them.

127.   Defendants' material false representations to Tishfield and their knowledge of same were with the intent to deceive him and fraudulently induce him to invest in the fund.

128.   Faruki, Hopkins, Barry, Hooper and Weilert (collectively, the "Individual Defendants") abused the corporate form in making these materially false and fraudulent representations and omissions, hiding behind companies over which they at all times had complete dominion and control.

129.   The Individual Defendants, to the extent they were members of a partnership, *de facto* or otherwise, used the partnership in making these material false and fraudulent representations, and are subject to joint and several liability for any and all liabilities imputed to the partnership.

130.   The statutory safe harbor for forward-looking statements under certain circumstances does not apply here.  These material false and fraudulent representations were not identified as "forward-looking statements" when made, and in the alternative, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the defendants are liable for those false forward-looking statements because at the time each of those statements were made, defendants knew that the particular forward-looking statement was false.

131.   As a proximate result of the wrongful conduct alleged herein, Tishfield suffered damages in the sum of no less than $1,000,000.

132.    By reason of the foregoing, defendants jointly and severally have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Tishfield for damages in an amount to be established at trial, but no less than $1,000,000.

## COUNT II

### (Violation of Section 20(a) of the Securities and Exchange Act of 1934 Against Faruki, Hopkins, Hooper, Barry and Weilert)

133.    Tishfield repeats and re-alleges each and every allegation in this Complaint and in the Exhibits as if set forth fully herein.

134.    The Individual Defendants directly or indirectly controlled Neural, Evolution, Hopkins & Associates, PC, Weilert Investments, LLC and the1X Fund (collectively "Entity Defendants").

135.    The Individual Defendants by reason of their senior management and membership positions in the Entity Defendants, respectively, directly or indirectly possessed the power to direct or cause the direction of the management and policies of the Entity Defendants.

136.    The Individual Defendants exercised this power.

137.    The Individual Defendants were culpable participants in the fraud perpetrated by the Entity Defendants.

138.    The Individual Defendants consciously misbehaved or acted recklessly with respect to the fraud perpetrated by the Entity Defendants.

139.    Among other things, the Individual Defendants participated in the day-to-day operations and management of the Entity Defendants.  They were aware of, assisted, conspired to prepare and assist, and acquiesced in the preparation of documents and information containing

false and misleading statements and omissions designed to induce Tishfield to invest in the fund and continue his investment.

140.   Tishfield would not have invested in the fund had he known of the false and misleading nature of the information provided by the Individual Defendants.

141.   The statutory safe harbor for forward-looking statements under certain circumstances does not apply here.  These material false representations were not identified as "forward-looking statements" when made, and in the alternative, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because at the time each of those statements were made, the particular speaker knew that the particular forward-looking statement was false.

142.   By reason of the foregoing, the Individual Defendants jointly and severally have violated Section 20(a) of the Exchange Act and are liable to Tishfield for damages in an amount to be established at trial but in no event less than $1,000,000.

## COUNT III

### (Violation of the Illinois Securities Law of 1953 Against Faruki, Hopkins, Hopkins and Associates, P.C., Hooper, Weilert Investments, LLC, Barry, Weilert, Neural, 1X Fund and Evolution)

143.   Tishfield repeats and re-alleges each and every allegation in this Complaint and in the Exhibits as if set forth in full herein.

144.   By the foregoing, defendants, in violation of Sections 11 and 12(F) of the Illinois Securities Act, 815 I.L.C.S. Sections 5/12(D) and (F), engaged in a transaction in connection with the sale of securities which violated an order of the Secretary of State preventing Faruki from doing so and worked or tended to work a fraud or deceit upon Tishfield.

145.   By the foregoing, defendants, in violation of Sections 11 and 12(G) of the Illinois Securities Act, 815 I.L.C.S. Section 5/12(G), obtained money from Tishfield through the sale of securities by means of untrue statements of material facts and omissions of material facts.

146.   By the foregoing, defendants, in violation of Sections 11 and 12(H) of the Illinois Securities Act, 815 I.L.C.S. Section 5/12(H), circulated statements to Tishfield pertaining to securities knowing or having reasonable grounds to know that the statements contained material representations that were false or untrue and contained material omissions.

147.   By the foregoing, defendants, in violation of Sections 11 and 12(I) of the Illinois Securities Act, 815 I.L.C.S. Section 5/12(I), employed a scheme or artifice to defraud Tishfield in connection with the sale or purchase of securities.

148.   The Individual Defendants abused the corporate form in providing these untrue statements of material facts and circulating these statements as part of the scheme to defraud Tishfield, hiding behind companies over which they at all times had complete dominion and control.

149.   The Individual Defendants, to the extent they were members of a partnership, *de facto* or otherwise, used the partnership in providing these untrue statements of material facts and circulating these statements as part of the scheme to defraud Tishfield, and are subject to joint and several liability for any liabilities imputed to the partnership.

150.   The statutory safe harbor for forward-looking statements under certain circumstances does not apply here.  These representations were not identified as "forward-looking statements" when made, and in the alternative, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the defendants are liable for those false forward-looking statements because at the time each of those statements were made, the

48

particular speaker knew that the particular forward-looking statement was false.

151.    Tishfield, through his counsel, has complied with the notice requirements enumerated in 815 I.L.C.S. 5/12, *et seq.*

152.    As a result of the aforesaid violations of the Illinois Securities Act, 815 I.L.C.S. 5/12, *et seq.,* by the defendants jointly and severally, Tishfield has suffered actual economic damages in an amount to be determined at trial but no less than $1,000,000, statutory interest of 10%, and attorneys' fees.

## COUNT IV

### (Fraud Against Faruki, Hopkins, Hopkins and Associates, P.C., Barry, Hooper, Weilert, Neural, Weilert Investments, LLC, 1X Fund and Evolution)

153.    Tishfield repeats and re-alleges each and every allegation in this Complaint and in the Exhibits as if set forth in full herein.

154.    In order to induce Tishfield into executing the PPM and invest in the fund, the defendants made the above material representations and omissions of presently existing or past facts, with the knowledge that those representations were false and with the intention that Tishfield rely on those representations.

155.    The PPM and its marketing materials included false information and omitted information material to Tishfiueld's decision to invest. Among the numerous material misrepresentations and omissions described in this Complaint and in the Exhibits, all of which are incorporated herein, the defendants falsely told Tishfield that there were other investors already in the fund and that they were investing $5,000,000.  They promised to invest Tishfield's money using "almost zero leverage" and "low risk" strategies.  They falsely represented a performance track record of the monies they false stated that they had. Fauki falsely reported that

49

he had his own money in the fund. They falsely touted a proprietary and confidential "high-frequency statistical arbitrage" trading program built by Ph. D.'s.  They falsely identified Mr. Sorkin as COO and promised liquidity, transparency and real-time trading reports.  They falsely identified RSM McGladry, Inc. as auditor and that it would provide quarterly and annual audited financial statements. They falsely stated that J.P. Morgan Securities, Inc., provided prime broker services. They falsely stated that Liccar CPA would be the Fund Administrator and would handle all accounting matters. They falsely represented the reporting of financial and accounting matters. All of this was false and communicated to fraudulently induce Tishfield to invest his money.  Once they received Tishfield's money, they continued making fraudulent statements to conceal and avoid detection of the misrepresentations and the true nature of the trading activity and the fund.  Tishfield was never informed before or after executing the PPM that defendant Hopkins had been arrested and was facing bank fraud charges, among other material omissions as detailed in this Complaint.

156.    Defendants knew that the representations and omissions detailed in this Complaint were false when they made them and did so solely for the purpose of defrauding Tishfield out of $1,000,000.

157.    Tishfield reasonably relied on the defendants' misrepresentations to his detriment in that as a result of the defendants' false representations, Tishfield executed the PPM and wired $1,000,000 to an account controlled by defendants.

158.    Given that Tishfield shows (i) a misrepresentation, (ii) scienter, (iii) reasonable reliance, and (iv) detriment, Tishfield possesses a cause of action against the defendants for common law fraud.

159.    All of the defendants participated in the fraud.